Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| MELANY LINARES ROMÁN Y CRISTÓBAL LINARES ROMÁN<br><br>*Apelados*<br><br>v.<br><br>BELINDA RAMOS PALERMO<br><br>*Apelante* | TA2026AP00193 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Núm.: CB2022RF00021<br><br>Sobre: Nulidad de Matrimonio |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de abril de 2026.

Comparece ante nos la señora Belinda Ramos Palermo (señora Ramos Palermo o apelante) mediante recurso de *Apelación* y solicita que revoquemos la *Sentencia*[1] emitida el 3 de diciembre de 2025[2] por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (TPI o foro apelado). En el referido dictamen, el TPI declaró *Con Lugar* la *Demanda*[3] presentada por Melany Linares Román y Cristóbal Linares Román (en conjunto, apelados). En consecuencia, declaró nulo el matrimonio entre el señor Cristóbal Linares Merle (señor Linares Merle) y la señora Ramos Palermo.

Por los fundamentos que expondremos a continuación, **confirmamos** la *Sentencia* apelada.

**I.**

El caso de autos tuvo su génesis el 23 de mayo de 2022, cuando los apelados instaron una *Demanda* sobre nulidad de matrimonio en contra de la señora Ramos Palermo. En síntesis,

---

[1] Apéndice 241 del recurso de *Apelación*.
[2] Notificada el 5 de diciembre de 2025.
[3] Apéndice 1 del recurso de *Apelación*.

estos alegaron que eran los hijos del señor Linares Merle, quién falleció luego de estar hospitalizado en dos ocasiones en el Hospital Perea. La primera hospitalización fue el 28 de marzo de 2022 hasta el 28 de abril de 2022. Aducen que, en dicha ocasión, el señor Cristóbal Linares Merle estuvo hospitalizado para recibir un tratamiento agresivo de quimioterapia. Además, expusieron que la segunda hospitalización fue del 29 de abril de 2022 al 5 de mayo de 2022.

Asimismo, esbozaron que, el 18 de abril de 2022, por haber tenido un episodio de agresividad, el señor Linares Merle fue sedado con varios medicamentos y, el día 19 de abril de 2022, le fue administrado un relajante y otro medicamento. A su vez, expusieron que, ese mismo día, mientras el señor Linares Merle estaba hospitalizado y sin capacidad para ello, la notaria Karillyn Leeaned Rodríguez Cruz (notaria Rodríguez Cruz) celebró el matrimonio entre la señora Ramos Palermo y el señor Linares Merle. Argumentaron que ese día, el señor Linares Merle no estaba consciente, alerta, ni orientado para tomar una decisión, por lo que razonan, que el matrimonio celebrado no cumplió con lo dispuesto en nuestro ordenamiento jurídico, pues el señor Linares Merle no pudo brindar consentimiento a dicho acto.

El 18 de agosto de 2022[4], la apelante presentó su *Contestación a Demanda*[5] en la cual aceptó algunas alegaciones y negó otras. En particular, alegó que el señor Linares Merle estaba consciente de lo que hacía y que así lo determinó la notaria Rodríguez Cruz, según

---

[4] Luego de que se le anotara la rebeldía a la señora Ramos Palermo por haber excedido el término para contestar la Demanda esta anunció la contratación de su representación legal y solicitó que se dejara sin efecto la anotación de rebeldía. El Tribunal, el 11 de agosto de 2022, dejó sin efecto la anotación de rebeldía, dispuso un término de diez (10) días para presentar alegación responsiva y autorizó el descubrimiento de prueba. Véase, entrada núm. 15 del Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[5] Apéndice 16 del recurso de *Apelación*.

los poderes que le confiere la Ley". Además, levantó varias defensas afirmativas.

Posteriormente, el 1 de febrero de 2023, los apelados presentaron una *Moción Solicitando Autorización para Enmendar Demanda*[6] junto a la *Demanda Enmendada*[7]. Allí alegaron una segunda causa de acción dirigida a que el matrimonio era nulo no solo porque no hubo consentimiento de parte de cualquiera de los contrayentes, sino también porque no se cumplieron con las formalidades requeridas para su constitución, especialmente, con la unidad de acto. No obstante, la señora Ramos Palermo sometió su alegación responsiva y negó la mayoría de los hechos alegados[8].

Transcurridos algunos incidentes procesales, el 22 de marzo de 2023, los apelados sometieron una *Moción Solicitando Sentencia Sumaria*[9] en la cual solicitaron que, al no existir hechos esenciales en controversia, se procediera a dictar sentencia sumaria a su favor. En respuesta, el 4 de mayo de 2023, la apelante sometió *Moción en Oposición a "Moción Solicitando (SIC) Sentencia Sumaria*["]]¹[10]. En ésta, arguyó que el elemento definitivo, constitutivo y determinante del matrimonio es el consentimiento de los contrayentes ante el funcionario u oficial celebrante y los dos testigos y no la suscripción de los documentos. De igual manera, esbozó que la unidad de acto a lo que se refiere es al momento de prestar el consentimiento por los contrayentes, no la suscripción de los formularios que se dirigen al Registro Demográfico.

Evaluadas las posiciones de las partes, el 24 de julio de 2023, el foro apelado emitió y notificó una *Resolución*[11] en la cual declaró

---

[6] Apéndice 51 del recurso de *Apelación*.
[7] Apéndice 52 del recurso de *Apelación*.
[8] Véase, Apéndice 63 del recurso de *Apelación*, *Contestación a Demanda Enmendada*.
[9] Apéndice 59 del recurso de *Apelación*.
[10] Apéndice 72 del recurso de *Apelación*.
[11] Entrada núm. 104 de SUMAC.

*No Ha Lugar* el petitorio de los apelados e hizo constar que el asunto en el caso de marras se atendería en una vista evidenciaria.

Así pues, el 10 de agosto de 2023, el TPI celebró una vista en la cual determinó lo siguiente:

- Requiere a la licenciada García que:
  - para el viernes 18 de agosto de 2023 cumpla con presentar el tercer interrogatorio emitido por la parte demandante e informe si va a entrevistar a la Sra. Cinthia Fortuna Perea, trabajadora social del Hospital Perea.
  - presente por escrito su solicitud en cuanto a la moción de sentencia sumaria emitida.
- Señala conferencia con antelación a juicio para el 3 de noviembre de 2023 a las 9:00 a.m. (videoconferencia), fecha para la cual quedaron citados los presentes en corte abierta[12].

Ese mismo día, la señora Ramos Palermo presentó una *Moción al Amparo de la Regla 36.4 de las de Procedimiento Civil*[13] y solicitó determinaciones iniciales o adicionales de hecho o derecho[14]. Considerada tal solicitud, el 6 de septiembre de 2023, el foro apelado emitió y notificó una *Resolución*[15] en la cual declaró *Ha Lugar* la moción presentada por la señora Ramos Palermo y formuló los siguientes hechos sobre los cuales no existía controversia sustancial:

1. Los demandantes Melany Linares Román y Cristóbal Linares Román son hijos del Sr. Cristóbal Linares Merle.
2. El Sr. Cristóbal Linares Merle falleció el 5 de mayo de 2022.
3. La causa inmediata de la muerte del Sr. Cristóbal Linares Merle fue un Melanoma Etapa IV.
4. El Sr. Cristóbal Linares Merle estuvo hospitalizado en el Hospital Perea en dos ocasiones.
5. La primera hospitalización fue del 28 de marzo de 2022 hasta el 28 de abril de 2022[16].

---

[12] Entrada núm. 117 de SUMAC.
[13] Entrada núm. 116 de SUMAC.
[14] En el ínterin, el 22 de agosto de 2023, los apelados volvieron a someter una Moción Solicitando Sentencia Sumaria, Véase, Apéndice 122 del recurso de *Apelación*. Allí detalló tres (3) hechos que según ellos no estaban en controversia. Presentada la oposición de la apelada, el TPI el 12 de febrero de 2024, emitió una *Resolución* en la cual concluyó que los hechos que alegadamente no estaban en controversia se encontraban íntimamente relacionados con las circunstancias bajo las cuales se celebró el matrimonio entre el señor Linares Merle y la señora Ramos Palermo, y la firma de documentos por partes y testigos relacionados al matrimonio cuya nulidad se solicitaba. Por ende, el foro apelado reiteró que los asuntos señalados debían ser dilucidados en una vista en su fondo. Véase, Apéndice 146 del recurso de *Apelación*.
[15] Apéndice 125 del recurso de *Apelación*.
[16] *Íd.*

Asimismo, señaló el siguiente hecho esencial sobre el cual existía controversia y ameritaba dilucidarse en una vista en su fondo:

1. Las circunstancias bajo las cuales se celebró el matrimonio entre el Sr. Cristóbal Linares Merle y la Sra. Belinda Ramos, y la firma de documentos por partes y testigos relacionados con el matrimonio cuya nulidad se solicita en la presente causa de acción[17].

Transcurrido algún tiempo y tras múltiples incidentes procesales, el juicio en su fondo se celebró los días 9[18], 10[19] y 11[20] de julio de 2025, y el 22 de agosto de 2025[21]. En el juicio, por la parte demandante y aquí apelados, se presentaron los siguientes testigos: Melany Linares Román y Alvia Linares Merle, las trabajadoras sociales Cynthia Fortuna Perea y Abigail Nadal, la enfermera Carmen Soto Vargas y los doctores Jorge Illanas Hernández y Jesús Manuel Román Vélez. Mientras que, por la parte demandada y aquí apelante, declaró Belinda Ramos Palermo, Adrián Cruz Martínez, la notaria Rodríguez Cruz y el Dr. Raúl López[22].

En cuanto a la prueba documental, se presentaron y admitieron en evidencia los siguientes documentos por estipulación:

| | |
|---|---|
| Exhibit I | Certificado de Nacimiento de Melany Linares Román |
| Exhibit II | Certificado de Nacimiento de Cristóbal Linares Román |
| Exhibit III | Certificado de Defunción de Cristóbal Linares Merle |
| Exhibit IV | Discharge Summary |
| Exhibit V | Certificado de Matrimonio de Cristóbal Linares Merle y Belinda Ramos Palermo |
| Exhibit VI | Instrucción General #37 a los Notarios |
| Exhibit VII(A) | Physician Order 4/12/22 |
| Exhibit VII(B) | Physician Order 4/18/22 (dos páginas) |
| Exhibit VII(C) | Physician Order 4/19/22 |
| Exhibit VII(D) | Progress Note 4/18/22 |
| Exhibit VII(E) | Progress Note 4/18-19/22 |
| Exhibit VII(F) | Progress Note 4/19/22 del Dr. Román |
| Exhibit VII(G) | Progress Note 4/19/22 del Dr. Illanas |
| Exhibit VII(H) | Nota Progreso Trabajo Social 4/19-21/22 de Cynthia Fortuna |
| Exhibit VII(J) | Hoja de Medicamentos 4/13-22/22 |
| Exhibit VIII | Formulario RD12 |

---

[17] *Íd.*

[18] Entrada núm. 230 de SUMAC.

[19] Entrada núm. 232 de SUMAC.

[20] Entrada núm. 233 de SUMAC.

[21] Entrada núm. 240 de SUMAC.

[22] Apéndice 241 del recurso de *Apelación,* pág. 4.

| Exhibit IX | Formulario RD14 |
| Exhibit X | Curriculum Vitae del Dr. Jesús Manuel Román Vélez |
| Exhibit XI | Curriculum Vitae del Dr. Jorge Illanas Hernández[23] |

La prueba documental admitida de la parte demandante fue la siguiente:

| Exhibit I | Carta del 28 de abril de 2022 suscrita por el Dr. Jesús Manuel Román Vélez |
| Exhibit II | Notas de Progreso y Laboratorios Clínicos (5 folios). |

Además, se admitió la siguiente prueba documental de la parte demandada:

| Exhibit I | Informe Pericial Dr. Raúl López, |
| Exhibit II | Estimado de Enfermería del 4/19/22 (4 folios), |
| Exhibit III | Estimado Riesgo a Caída del 4/29/22 y |
| Exhibit IV | Curriculum Vitae del Dr. Raúl López[24]. |

Evaluada la totalidad de la prueba testifical y documental, el 3 de diciembre de 2025[25], el TPI emitió una *Sentencia* en la cual realizó las siguientes determinaciones de hechos:

1. Los demandantes Melany Linares Román y Cristóbal Linares Román son hijos del Sr. Cristóbal Linares Merle.
2. El Sr. Cristóbal Linares Merle falleció el 5 de mayo de 2022.
3. La causa inmediata de la muerte del Sr. Cristóbal Linares Merle fue un Melanoma Etapa IV.
4. El Sr. Cristóbal Linares Merle estuvo hospitalizado en el Hospital Perea en dos ocasiones.
5. La primera hospitalización fue del 28 de marzo de 2022 hasta el 28 de abril de 2022 para recibir tratamiento contra el cáncer y por su problema respiratorio como consecuencia de ello. Durante su estadía, su hija Melany y la Sra. Belinda Ramos lo veían diariamente.
6. La parte demandante está compuesta por Melany y Cristóbal Linares Román, hijos de Cristóbal Linares Merle, quien falleció el 5 de mayo de 2022. La madre de los demandantes, Marisol Román Ruiz, y el Sr. Cristóbal Linares se divorciaron hace más de trece (13) años. Luego del divorcio, la Sra. Melany Linares declaró que veía a su papá una vez cada dos semanas y hablaba con él por teléfono todos los días. Ella describió su relación con su papá como una cariñosa y respetuosa.
7. Según el certificado de matrimonio, la Sra. Belinda Ramos y Cristóbal Linares Merle se casaron el 19 de abril de 2022, estando Cristóbal Linares Merle

---

[23] *Íd.*, pág. 5.
[24] *Íd.*
[25] Notificada el 5 de diciembre de 2025.

hospitalizado. El matrimonio fue celebrado ante la notaria, Lcda. Karillyn Leeaned Rodríguez Cruz.

8. La señora Ramos, ella y el fenecido llevaban juntos como pareja desde abril de 2011.

9. Esa mañana del 19 de abril de 2022, la Sra. Melany Linares estableció mediante su testimonio que su padre estaba decaído, no abría los ojos, estaba dormido y sin poder hablar. Luego, en la tarde, ella visitó la oficina del doctor Román Vélez para que le diera más información sobre la condición de su papá. Este le indicó que el cáncer lo tenía regado y que era cuestión de días o semanas.

10. Estando en su hogar, el doctor Román la llamó y le informó que le había conseguido una cita con la trabajadora social.

11. La Sra. Melany Linares regresó al hospital y en vez de dirigirse a la oficina de la trabajadora social, que queda justo en el mismo piso donde estaba la habitación de su papá, decidió ir primero a la habitación de su padre para verlo. La habitación de su padre tenía la peculiaridad de que tenía doble puertas, la puerta que daba hacia el pasillo y otra puerta que daba al cuarto privado donde estaba ubicada su cama.

12. Al abrir la primera puerta, la Sra. Melany Linares escuchó quejidos de su padre, diciendo "ayúdame". En esa segunda puerta había un recuadro de cristal y ella observó que había varias personas en el cuarto. Ella abrió la puerta y fue directo hacia su papá, y le dijo "¿papi estas bien?, ¿qué pasa?, ¿qué te duele?"

13. La Sra. Melany Linares reconoció a la Sra. Belinda Ramos, a las dos (2) personas que fungían como testigos, porque los conocía de antes, el Sr. Adrián Cruz y a la Sra. Nancy Vélez, y a la que ahora conoce era, la Lcda. Karilyn Rodríguez. La Sra. Melany Linares les preguntó a las personas, "ustedes no ven lo que está pasando, no lo ayudan, él está quejándose". Las personas no le contestaron. La Sra. Melany Linares entendió que había un proceso de matrimonio.

14. La Sra. Melany Linares salió de la habitación y se encontró con la Sra. Carmen Soto, que es la supervisora del piso de las enfermeras. La Sra. Melany Linares le mencionó lo que está pasando allí, que quieren casar a su papá en esas condiciones y la señora Soto le dijo que entrara, que regresaba ahora. La Sra. Melany Linares entró a la habitación, y vio que su papá seguía quejándose, que estaba desnudo, en pamper, expuesto, frágil y vulnerable.

15. Al poco tiempo, entró la trabajadora social Abigail Nadal y un breve tiempo después entró la enfermera Carmen Soto, con el Dr. Illanas y por último entró la trabajadora social Cynthia Fortuna. En ese preciso momento, se detuvo lo que estaba pasando allí. Según el testimonio de la señora Linares, ella se quedó con su padre mientras el Dr. Illanas y la Lcda. Karillyn Rodríguez y los demás salieron del área inmediata del cuarto.

16. Cuando regresaron la licenciada Rodríguez y la Sra. Belinda Ramos al área de la cama, la licenciada Rodríguez informó que el proceso de la ceremonia terminaría después. La señora Linares le contestó que no tenía problema en que la señora Ramos se casara con su papá, pero que fuese en un momento en que él estuviese en condiciones, apto, y consiente para tomar una decisión.

17. Acto seguido, la licenciada Rodríguez y la Sra. Belinda Ramos se fueron de la habitación y la señora Linares se quedó sola con su padre.

18. Luego, la Sra. Melany Linares conversó con la Sra. Carmen Soto, quien le manifestó que en el récord iban a poner una nota del doctor Illanas, dejando saber lo que había ocurrido en ese día y cu[á]l era la condición de su papá en ese momento.

19. Del 19 de abril hasta el 5 de mayo de 2022, el señor Linares apenas hablaba, hacía quejidos o movimientos para que lo movieran de lado en la cama.

20. La Sra. Carmen María Soto Vargas declaró que era enfermera graduada y para el 19 de abril de 2022 era supervisora de enfermería en el Hospital Perea donde estuvo recluido el señor Linares. Como supervisora tenía a su cargo dos (2) áreas clínicas en el segundo piso del hospital. Sus funciones eran evaluar el área clínica, la ejecutoria de las enfermeras a su cargo y evaluar a los pacientes conforme a las normas del hospital y de las agencias acreditadoras.

21. En relación con la ceremonia, la señora Soto Vargas declaró que le manifestó a los allí presentes que el Sr. Cristóbal Linares no estaba en condiciones para casarse.

22. Ella declaró que el señor Linares no estaba alerta y que estaba balbuceando y que buscó al doctor Illanas para que evaluara al paciente, quien luego lo evaluó y certificó que no estaba en condiciones en ese momento para tomar ninguna decisión. Para la señora Soto Vargas, nadie del personal de salud en el hospital sabía que la boda se iba a celebrar ese día.

23. Por otro lado, la Sra. Cynthia Fortuna declaró que tenía un bachillerato en trabajo social y trabajaba para los hechos de este caso como trabajadora social en el Hospital Perea. Sus funciones incluían hacer evaluaciones iniciales a los pacientes para ayudar a estos con el equipo que pudieran necesitar luego de la hospitalización y para ayudar con los "homecare" y los hospicios. Como trabajadora social también trataba de resolver cualquier otro problema familiar que pudiese surgir durante la hospitalización.

24. En relación con el incidente del 19 de abril de 2022, la señora Fortuna declaró que se le explicó a la Lcda. Karillyn Rodríguez que el paciente estaba balbuceando y que gritaba con dolor y que, aunque en ocasiones estaba orientado, por el dolor que tenía no lo estaba en ese momento.

25. En el récord del hospital, la señora Fortuna escribió la siguiente nota en el récord: Junto a Dr. Illanas se le explica a la Sra. Belinda Ramos que paciente se

encuentra desorientado y con medicamentos muy fuertes para el dolor en su sistema. Por lo que no está apto, ni alerta, ni orientado para indicar si desea casarse o no. Se dialoga en habitación con Sra. Belinda Ramos y luego con hija de paciente la Sra. Melanie Linares por separado debido a conflicto entre ellas.

26. La Sra. Abigail Nadal declaró que era trabajadora social de profesión, con una maestría en consejería de salud mental, y que desde el 2016 fungía en el Hospital Perea como trabajadora social. Entre sus funciones estaba preparar el plan de alta para los pacientes y además manejaba casos psiquiátricos, casos de violencia doméstica, de agresión sexual, de maltrato de niños, de maltrato de ancianos y de los pacientes que estaban hospitalizados.

27. En cuanto al 19 de abril de 2022, la Sra. Abigail Nadal declaró que el señor Linares estaba sedado y que apenas podía hablar por el dolor y los medicamentos que le habían administrado.

28. El doctor Illanas declaró, como perito regular y de ocurrencia. Para las fechas de los hechos era médico interno, haciendo el internado en el Hospital Perea. El doctor Illanas evaluó al Sr. Cristóbal Linares cuando entró a la habitación de este el 19 de abril de 2022. Allí encontró al paciente con mucho "estress" y haciendo muchos gestos y sonidos de dolor.

29. Para verificar la capacidad del fenecido, el doctor Illanas evaluó si este estaba orientado en tiempo, lugar y espacio. El doctor Illanas declaró que el señor Linares estaba alerta porque estaba despierto y que este logró contestar su nombre y donde estaba, pero no sabía que día, ni año.

30. El doctor Illanas, además, verificó el récord médico y encontró que desde la noche anterior estaba bajo los efectos de una serie de medicamentos (Ativan, Benadryl, Haldol y Demerol, entre otros). El doctor Illanas le explicó esto a la licenciada Rodríguez y le explicó que dichos medicamentos podían afectar el estado mental y capacidad del señor Linares. Aunque la licenciada Rodríguez entendió lo expresado por el médico, ella le hizo caso omiso reiterándose su opinión de que el señor Linares estaba capacitado.

31. El doctor Illanas escribió la siguiente nota en el récord médico del Sr. Linares:

> I was notified by floor supervisor to evaluate patient in room 228 due to disorientation and a family situation. Upon arrival social worker, family member and an attorney were present in room. Patient was evaluated this morning and again in the afternoon with altered mental status since the night before. Patient was in acute pain, oriented to person and place but not time and due to aggressive behavior, the previous night he was started on sedative mediation Haldol, Diphenhydramine and Ativan to avoid self harm and interruption of medical treatment. Patient later managed with Demerol, Phenergan and Clonazepam for pain and agitation. After evaluation and sudden change in mental status as

well as use of multiple sedative medications, patient's decision-making capacity is questionable. Patient with metastatic disease on ANT as well as associated comorbidities. Family members, social worker and attorney were notified of patient's current condition and referred having understood.

32. El doctor Illanas declaró, y al Tribunal le mereció entera credibilidad, que al paciente no estar orientado en las tres esferas no estaba completamente orientado y no tenía la capacidad para discernir.

33. El Dr. Jesús Manuel Román Vélez declaró, como perito de ocurrencia y como perito regular. El doctor Román Vélez conocía al señor Linares desde hacía muchos años, toda vez que el señor Linares había estado casado con su prima y madre de los demandantes.

34. El doctor Román Vélez admitió al señor Linares al Hospital Perea porque estaba dedicado de salud como resultado de su avanzado cáncer. El señor. Linares se veía mal, hablaba con lentitud, tenía dificultad respiratoria, tenía hinchado todo su cuerpo, estaba pálido y tenía líquido en el pulmón.

35. Previo al 18 de abril de 2022, el doctor Román Vélez declaró que la Sra. Belinda Ramos le informó que ella y el señor Linares tenían planes de casarse, pero que como él no podía moverse, le solicitó unos documentos para llevar al Registro Demográfico y que le diera referido para hacerle los laboratorios. No obstante, cuando tuvo conocimiento que la boda fue el 19 de abril de 2022, esto le sorprendió al doctor Román porque el paciente estaba en condición crítica y según su opinión profesional, no tenía la capacidad para tomar esa decisión. De hecho, ese mismo día se le había realizado un procedimiento para sacarle agua del pulmón, que de no haberse llevado a cabo hubiera fallecido.

36. Para el 18 de abril de 2022, el señor Linares estaba en delirio y se le tuvo que recetar Haldol, Ativan y Benadryl, los cuales le fueron administrados. El doctor Román Vélez declaró que el Haldol es un anticicótico que ayuda al paciente cuando tiene delirio. El Ativan tiene un efecto sedante, da sueño y calma al paciente. El Benadryl se usa en conjunto con el Haldol por dos razones, primero evita efectos secundarios que da el Haldol, como movimientos raros, y el otro es su efecto sedante.

37. Según el doctor Román Vélez, el delirio en un paciente altera su estado de conciencia, puede estar alerta pero desorientado, puede ver cosas que no están, puede hablar incoherencia y puede estar fuera de la realidad. Según el doctor Román Vélez, el señor Linares tenía delirio con cambio de conciencia agudo.

38. El día 19 de abril de 2022, la condición del señor Linares se deterioró, tenía dificultad para respirar, estaba desorientado y con poca respuesta. El doctor Román Vélez lo revisó y le hizo una tomografía torácica. En ella encontró líquido en el pulmón. Por ello, le hizo un procedimiento llamado toracentesis

que conlleva una incisión en el tórax, un catéter y extracción del líquido para que el pulmón pueda respirar. Se le extrajeron dos (2) litros, de agua, lo cual refleja un paciente que estaba críticamente enfermo y que, de no haberle hecho la intervención, pudo haber muerto ese día.

39. Según el doctor Román Vélez, la toracentesis da mucho dolor por lo que le cambió la morfina por Demerol cada 6 horas con Phenergan, que se usa para las náuseas y que también tiene un efecto sedante y le dio Clonazepam.

40. Antes del procedimiento, no estaba orientado. Estaba soñoliento hablaba estropajoso y tenía un estado de conciencia disminuida. Luego del procedimiento su dificultad respiratoria mejoró, pero aún estaba desorientado.

41. El doctor Román estableció que, desde el punto de vista médico, para que un paciente pueda tomar decisiones debe cumplir con estar ubicado en tres categorías: tiempo, lugar y espacio. Explicó que el "decision making capacity" de un paciente no es un trabajo de psiquiatría, sino del médico que está a cargo.

42. Luego del 19 de abril, le indicó a la demandada que ese día no era un buen momento para llevar a cabo la boda porque el paciente no estaba apto para hacerlo y ella le solicitó otra carta para ir al Registro Demográfico para iniciar el proceso nuevamente. La carta se le preparó, pero nunca fue a la oficina a buscarla.

43. El doctor Román Vélez declaró que era su opinión que, para la ceremonia matrimonial del 19 de abril de 2022, el Sr. Cristóbal Linares no tenía la capacidad para tomar dicha decisión. Le damos entera credibilidad a su testimonio. El paciente estaba críticamente enfermo hasta el punto de que ese día se le hizo una toracentesis guiada por sonografía para sacar liquido del pulmón para que el pudiera respirar. Su condición de melanoma había metastizado el hígado, teniendo por ende insuficiencia hepática.

44. El doctor Román explicó que los medicamentos que se tomó el señor Linares 24 horas previo al evento del matrimonio fueron significativos y pueden afectar la capacidad para la toma de decisiones. Indicó que el 19 de abril de 2022 le realizó preguntas al señor Linares antes de realizarle el procedimiento en la mañana y estaba desorientado. Aceptó que eso no surge del expediente y que en las notas de la trabajadora social y del doctor Illanas surge que sí estaba orientado, pero desconoce las pruebas que ellos realizaron.

45. Su conclusión, basada en el expediente, los medicamentos prescritos y su experiencia es que el señor Linares no estaba apto para casarse. A preguntas del Tribunal, expresó el doctor Román que los medicamentos que estaba utilizando el señor Linares generalmente dan somnolencia, retrasan los movimientos motores de ejecutar y hablar, pueden tener efectos secundarios como movimientos

involuntarios y retrasan el área cognitiva por el daño en el hígado.

46. El señor Linares estaba bajo los efectos de múltiples medicamentos que producen sedación y que, según el doctor Román Vélez, afectan su "Decisión Making Capacity". El efecto de estos medicamentos se magnifica porque son medicamentos con metabolismo hepático.

47. Además, los otros profesionales de la salud que vieron al señor Linares ese día: doctor Illanas, las trabajadoras sociales y la enfermera concluyeron que ese día el paciente no estaba apto para tomar decisiones ni para casarse.

48. El Dr. Raúl López, psiquiatra, declaró por la parte demandada. Según el doctor López, el señor Linares estaba competente para tomar la decisión de casarse con la Sra. Belinda Ramos y que no hay evidencia clínica que derrotara la presunción de competencia.

49. Según el doctor López, los factores que apoyan su opinión son los siguientes:

a) el señor Linares llevaba más de once (11) años de relación de pareja con la Sra. Belinda Ramos;
b) la notario corroboró la anuencia de este para casarse;
c) la alegación de que el señor Linares no se encontraba competente por los efectos de los medicamentos es altamente improbable;
d) el estar parcialmente desorientado en tiempo no interfiere con la competencia del individuo.

50. El Dr. Raúl López Menéndez, es perito psiquiatra y fue contratado para realizar una evaluación de la data disponible para determinar la competencia del Sr. Linares para contraer matrimonio.

51. El doctor señaló que no hay evidencia de un efecto directo de los medicamentos que estaba tomando el señor Linares que haya sido documentado por el personal del hospital o por un psiquiatra. En su opinión pericial, el decir que por esos medicamentos su consciencia estaba altera y no podía consentir es una especulación educada, pero, sin un análisis de niveles sanguíneos es imposible determinarlo.

52. El doctor López no examinó al señor Linares. No obstante, opinó que no existe prueba científica a un nivel grado de certeza médica que contravenga la presunción de capacidad. No existe una evaluación psiquiátrica, no existe pruebas espec[í]ficas y en el mundo de las posibilidades, es bien remoto que los medicamentos utilizados hubieran alterado la capacidad del señor Linares. Además, en su opinión, no hay evidencia para establecerlo. No obstante, admitió que los medicamentos utilizados producen sedación y posiblemente podrían afectar el "decision making capacity" del Sr. Linares.

53. La señora Ramos admitió que el día 19 de abril de 2022, la abogada que contrató para celebrar el matrimonio, los declaró marido y mujer, pero no llegaron a firmar los documentos porque fue cuando la hija de su esposo llegó al cuarto.

54. Además, estableció que los papeles del Registro Demográfico se completaron el 26 de abril.

55. En cuanto a la ceremonia, esta fue interrumpida y no fue hasta el 26 de abril de 2022 que el Sr. Cristóbal Linares Merle firmó ante la demandada Belinda Ramos y ante la Lcda Karilyn Rodríguez la declaración jurada requerida. Los testigos no presenciaron dicha firma. Estos firmaron como testigo a las afueras del Hospital Perea ese día 26 de abril de 2022.

56. Lcda. Karillyn Rodríguez declaró sobre la anuencia del señor Linares para casarse y que durante la ceremonia todo reflejaba felicidad, amor y alegría.

57. La licenciada Rodríguez, previo a la ceremonia no hizo preguntas sobre la condición y el récord médico del señor Linares.

58. Aun cuando fue informada luego, por el doctor Illanas de la condición médica del Sr. Linares, ella determinó proceder otro día con la ceremonia.

59. La certificación médica para contraer matrimonio, que forma parte de la licencia para contraer matrimonio (Forma RD-12) fue firmada por el Dr. José R. Meléndez el 13 de abril de 2022.

60. Según la propia forma RD-12, el Registro Demográfico expide la licencia o autorización para casarse el 18 abril de 2022, teniendo los solicitantes hasta el 23 de abril de 2022 para así hacerlo, o sea diez días después de la fecha de la certificación médica.

61. La ceremonia no se llevó a cabo dentro de los diez (10) días requeridos[26].

Es por lo anterior que, el foro apelado declaró *Con Lugar* la *Demanda* y, por consiguiente, declaró nulo el matrimonio del señor Linares Merle y la señora Ramos Palermo. De igual manera, le ordenó al Registro Demográfico de Puerto Rico a cancelar el certificado de matrimonio.

Inconforme con el dictamen, el 22 de diciembre de 2025, la apelante presentó una *Moción en Solicitud de Reconsideración*[27]. En síntesis, adujo que el TPI aplicó de forma errónea el concepto de capacidad matrimonial al equipararlo indebidamente con incapacidad civil general basada en el estado clínico del señor Linares Merle, sin realizar el análisis jurídico requerido sobre su aptitud de consentir. De igual forma, arguyó que el foro apelado incidió al extender el requisito de unidad de acto a la firma de los

---

[26] Apéndice 241 del recurso de *Apelación,* págs. 6-12.
[27] Apéndice 244 del recurso de *Apelación.*

documentos posteriores, lo cual incide a su entender en exigencias no contempladas por nuestro ordenamiento jurídico. Por su lado, el 8 de enero de 2026, los apelados sometieron su *Oposición a Moción de Reconsideración*[28] en la cual alegaron que la determinación del foro apelado estaba plenamente sustentada en prueba testifical y documental que demostraba que el señor Linares Merle no contaba con capacidad para prestar su consentimiento al momento de contraer matrimonio.

Evaluados los escritos de ambas partes, el 20 de enero de 2026[29], el TPI emitió una *Resolución sobre Moción de Reconsideración*[30] y declaró *No Ha Lugar* el petitorio de la señora Ramos Palermo.

Insatisfecha aun, el 23 de febrero de 2026, la apelante acudió ante este foro intermedio y le imputó al TPI la comisión de los siguientes errores:

> PRIMER SEÑALAMIENTO DE ERROR: Erró el Tribunal de Primera Instancia al concluir que no se cumplió con el requisito de unidad de acto, al extender indebidamente dicho concepto a la firma de la declaración jurada contenida en el certificado de matrimonio, creando un requisito no contemplado por el Código Civil y elevando formalidades documentales posteriores a elementos constitutivos del vínculo matrimonial.

> SEGUNDO SEÑALAMIENTO DE ERROR: Erró el Tribunal de Primera Instancia al declarar la nulidad del matrimonio por alegada falta de consentimiento, al concluir que el señor Cristóbal Linares Merle carecía de capacidad para consentir, basándose en consideraciones clínicas y médicas que no sustituyen el análisis jurídico requerido sobre la capacidad matrimonial, ignorando la presunción de validez del matrimonio y apreciando incorrectamente la evidencia que demostraba la prestación de consentimiento.

El 25 de febrero 2026, emitimos una *Resolución* concediéndole hasta el 25 de marzo de 2026 a los apelados para que presentaran su alegato en oposición. En cumplimiento con lo anterior, el 20 de marzo de 2025, los apelados sometieron un escrito intitulado *Alegato en Oposición a Apelación*. En el mismo, arguyeron que, el TPI

---

[28] Apéndice 248 del recurso de *Apelación*.
[29] Notificada el 22 de enero de 2026.
[30] Apéndice 252 del recurso de *Apelación*.

no erró pues mediante los testimonios ofrecidos en el juicio quedó constatado que el señor Linares Merle no tenía la capacidad para tomar la decisión de casarse con la señora Ramos Palermo, por ende, el matrimonio era nulo.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II.

### -A-

El matrimonio es una institución que procede de un contrato civil por medio del cual dos personas naturales se obligan mutuamente a ser cónyuges y a cumplir los deberes que impone la ley[31]. Nuestro ordenamiento establece que la disolución o anulación del vínculo únicamente procede por los fundamentos expresamente previstos en el propio Código Civil de 2020[32]. Así pues, los requisitos necesarios para contraer matrimonio son: (a) **capacidad legal de los contrayentes**; (b) consentimiento expreso de las partes contrayentes; y (c) autorización y celebración de un contrato matrimonial, observando las formas y solemnidades prescritas por la ley[33]. (Énfasis nuestro).

Esbozado lo anterior, es menester puntualizar que tiene capacidad para contraer matrimonio la persona que: (a) es mayor de edad; (b) **tiene discernimiento para consentir a la unión y obligarse a cumplir los deberes que conlleva**; y (c) no está impedida por la ley a unirse en matrimonio al otro contrayente[34]. (Énfasis nuestro). Por otro lado, es importante destacar que, la capacidad de la persona natural, mayor de edad, de obrar por sí misma se presume. No obstante, dicha presunción admite prueba en contario. De hecho, la presunción puede ser rebatida en juicio

---

[31] Art. 376 de la Ley Núm. 55-2020, según enmendada, conocida como "Código Civil de Puerto Rico" de 2020 (Código Civil de 2020), 31 LPRA sec. 6591.
[32] *Íd.*
[33] Art. 377 del Código Civil de 2020, 31 LPRA sec. 6592.
[34] Art. 378 del Código Civil de 2020, 31 LPRA sec. 6593.

donde el tribunal dicte una sentencia de incapacitación absoluta o de restricción parcial de la capacidad por las causas y la extensión que determina la ley[35].

Ahora bien, con relación a las formas y solemnidades necesarias para la celebración del matrimonio establecidas en el Código Civil de Puerto Rico del 2020, los contrayentes tienen que:

(a) someterse a los exámenes médicos que exige la ley;

(b) **suscribir una declaración jurada que dé fe de su capacidad para contraer matrimonio, que está contenida en el certificado de matrimonio que provee el Registro Demográfico conforme a lo dispuesto en esta sección**;

(c) obtener la licencia matrimonial que exige la ley;

(d) formalizar el contrato matrimonial ante una persona autorizada, observando las formas y solemnidades prescritas por la ley[36]. (Énfasis nuestro).

Referente a la declaración jurada requerida por ley, la misma deberá contener entre otras cosas, la fecha, la hora y el lugar de la celebración del matrimonio; el nombre y el carácter del celebrante; y el nombre y la dirección residencial de los dos testigos del acto[37]. De igual manera, los contrayentes deben jurar y firmar la declaración jurada ante la persona autorizada para celebrar el matrimonio, quien queda también facultada para tomarles dicho juramento[38]. Así pues, "[e]l celebrante debe examinar la declaración jurada suscrita por los contrayentes para constatar el cumplimiento con los requisitos que exige este título. **Luego la firmará junto a los contrayentes y a los dos testigos del acto para formalizar la celebración del matrimonio**. Sin embargo, si conoce o sospecha que los contrayentes están impedidos por la ley para casarse, no puede autorizar la unión"[39]. (Énfasis nuestro).

Por otra parte, el Artículo 24 de la Ley Núm. 24 del 22 de abril de 1961, según enmendada, conocida como la "Ley del Registro

---

[35] Véase, Art. 100 del Código Civil de 2020, 31 LPRA sec. 5601.
[36] Art. 384 del Código Civil de 2020, 31 LPRA sec. 6611.
[37] Art. 389 del Código Civil de 2020, 31 LPRA sec. 6616.
[38] Art. 390 del Código Civil de 2020, 31 LPRA sec. 6617.
[39] Art. 393 del Código Civil de 2020, 31 LPRA sec. 6632.

General Demográfico de Puerto Rico" (Ley Núm. 24) requiere la observación de la unidad de acto durante la ceremonia. En específico dispone que:

> Toda persona autorizada por la ley, ante la que se hubiere celebrado el matrimonio, estará obligada a entregar dentro de los diez (10) días siguientes a la celebración del mismo, al encargado del Registro del distrito en que tuvo lugar dicha ceremonia, la licencia matrimonial y la declaración jurada que hubiesen presentado los contrayentes de acuerdo con las disposiciones de la ley, junto con la certificación de la celebración del matrimonio, que expresará la fecha y lugar en que se hubiera celebrado el mismo y contendrá las firmas del celebrante y contrayentes y de los testigos presenciales del acto[40].

De igual forma, la Instrucción General #37 emitida por la Oficina de Inspección de Notarías en la sección (B) (3) establece que:

> Los notarios y las notarias deben asegurarse de que al requerirse sus servicios para oficiar una boda cumplan de igual forma con las normas que rigen el ejercicio de la profesión notarial. Ello, toda vez que la consideración de la Asamblea Legislativa para delegarles esa competencia fue el alcance y efecto de sus actuaciones como notarios y notarias bajo el palio de la fe pública notarial delegada en ellos y ellas. En atención a esto, se orienta a los notarios y notarias tener en cuenta, entre otros, los asuntos que se señalan a continuación.
> [...]
> 2. **La capacidad de las personas contrayentes y su consentimiento**, el conocimiento de estas y sus pormenores personales, así como la obligación de orientarles y advertirles sobre sus deberes y responsabilidades al contraer matrimonio. Artículos 14 y 15 de la Ley Notarial, 4 LPRA secs. 2032 y 2033.
> [...]
> 5. **La observación de la unidad de acto durante la** ceremonia. Artículo 24 de la Ley Núm. 24 de 1931, 24 LPRA sec. 1163 (Énfasis nuestro).

Esbozado lo antes expuesto, es correcto determinar que la declaración jurada debe ser coetánea al acto del casamiento para asegurar que las circunstancias sobre las cuales descansa el juramento sean fieles y de fácil comprobación[41]. Pues al exigir que ambos contrayentes juren y firmen la declaración frente al oficiante, el acto adquiere mayor solemnidad; incluso, dota de mayor convicción al hecho mismo de la celebración del matrimonio[42]. Por

---

[40] Art. 24 de la Ley Núm. 24, *supra.*
[41] Miguel R. Garay Auban, Código Civil, Tomo 2, *Las Instituciones Familiares*, 2da Edición, pág. 76.
[42] *Íd.*

ende, la firma de la declaración jurada es parte de la celebración del matrimonio y una de las formalidades específicamente requeridas por ley. Esto, debido a que, no se trata de un mero acto posterior como lo sería su envío al Registro Demográfico, según lo dispone el Artículo 394 del Código Civil[43].

En última instancia, es importante destacar que nuestro ordenamiento jurídico dispone que un matrimonio es nulo si: (a) no ha habido consentimiento de parte de cualquiera de los contrayentes; (b) se ha celebrado en contravención de alguno de los impedimentos señalados por este Código; o (c) no se han cumplido las formalidades requeridas para su constitución[44]. A su vez, el Código Civil del 2020 establece que la acción de nulidad la puede instar: (a) cualquiera de los cónyuges; (b) cualquier persona con interés legítimo en la nulidad del vínculo; y (c) el ministerio público[45].

## III.

En apretada síntesis, la apelante alegó que el foro apelado incidió al declarar la nulidad del matrimonio, al interpretar incorrectamente el requisito de unidad de acto y al concluir, sin el debido análisis jurídico, lo cual provoca una modificación a la presunción de validez, que uno de los contrayentes carecía de capacidad para consentir. Por estar íntimamente relacionados, discutiremos en conjunto los dos (2) errores señalados por la señora Ramos Palermo.

Por su parte, los apelados adujeron que el TPI no erró, pues mediante los testimonios ofrecidos en el juicio, quedó constatado que el señor Linares Merle no tenía la capacidad para tomar la

---

[43] 31 LPRA 6633.
[44] Art. 403 del Código Civil de 2020, 31 LPRA sec. 6661.
[45] Art. 404 del Código Civil de 2020, 31 LPRA sec. 6662.

decisión de casarse con la señora Ramos Palermo, por ende, el matrimonio era nulo.

Analizado el expediente ante nuestra consideración, somos de la opinión que el señor Linares Merle no contaba con la capacidad exigida por nuestro ordenamiento para brindar su consentimiento para casarse con la apelante el 19 de abril de 2022. Asimismo, colegimos que no se cumplieron con las formalidades requeridas para la constitución del matrimonio según establece el Código Civil de 2020. Veamos.

Como adelantamos en la exposición del derecho, un matrimonio es nulo si no ha habido consentimiento de parte de cualquiera de los contrayentes y si no se han cumplido las formalidades requeridas para su constitución. En el caso de autos, quedó constatado a través de los diferentes testimonios y la prueba documental admitida que el señor Linares Merle estaba críticamente enfermo hasta el punto de que ese día se le hizo una toracentesis guiada por sonografía para sacar liquido del pulmón para que éste pudiera respirar. Asimismo, la prueba testifical y documental demostró que ese día el señor Linares Merle no estaba apto para tomar decisiones. Esto, debido a que el paciente se encontraba desorientado y con medicamentos muy fuertes para el dolor en su sistema.

Es menester enfatizar que la notaria Rodríguez Cruz estaba obligada a examinar la declaración jurada y constatar que se cumplieran con los requisitos exigidos por nuestro ordenamiento. Ante el cuadro clínico del señor Linares Merle, resulta forzoso concluir que la Notaria Rodríguez Cruz no constató el cumplimiento de todos los requisitos de ley. Esto, debido a que el señor Linares Merle no poseía capacidad para expresar su consentimiento o reconocer la voluntariedad de sus actuaciones, pues la sedación y el efecto de los medicamentos utilizados en su persona mermaban

su capacidad para consentir y expresar la voluntariedad de sus acciones.

Por otra parte, los Artículos 24 y 393 del Código Civil del 2020, *supra*, requieren que en la celebración del matrimonio haya unidad de acto. Surge de la prueba presentada que la señora Ramos Palermo, el señor Linares Merle y los testigos firmaron días después de la supuesta celebración de la boda la declaración jurada que se suponía diera fe de la capacidad para contraer matrimonio. Mas aun, los testigos tampoco presenciaron cuando el señor Linares Merle estampó su firma en la declaración jurada, por lo que no hubo unidad de acto. Por lo tanto, ninguno de los errores señalados fue cometido, por lo cual, decretamos que el matrimonio entre la señora Ramos Palermo y el señor Linares Merle es nulo.

**IV.**

Por los fundamentos antes expuestos, ***confirmamos*** la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones